**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| JUSTIN MILES SANDERS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO.  5:18-CV-00049-RWS** |
| | § | |
| DIRECTOR TDCJ-CID, LORIE DAVIS, | § | |
| DIRECTOR; | § | |
| | § | |
| Defendant. | § | |

## <u>OPINION</u>

Petitioner Justin Miles Sanders, an inmate confined within the Texas Department of Criminal Justice, Correctional Institutions Division, through counsel, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.      FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

Late on a summer night in 2013, Texarkana police received reports of a disturbance at a park in the city.  Texarkana police officer William Sprague investigated, arriving at the park with his lights flashing.   Immediately, cars began to flee.  In the mayhem, one of those cars struck and killed Officer Sprague. The state contended Petitioner was behind the wheel.

After a jury trial in the 5th District Court of Bowie County, Texas, petitioner was convicted of felony murder.  He was sentenced to 30 years of imprisonment.  The conviction was affirmed by the Texas Court of Appeals for the Sixth District.  *Sanders v. State*, No. 06-14-00079-CR, 2015 WL 4744406 (Tex.App.-Texarkana 2015).  The Texas Court of Criminal Appeals denied a petition for discretionary review.  *Sanders v. State*, PDR No. 1171-15.

Petitioner subsequently filed a state application for writ of habeas corpus. The Court of Criminal Appeals denied the application without written order on the findings of the trial court without a hearing.  *Ex parte Sanders*, Appl. No. 837,609-01.

## II.     GROUNDS FOR REVIEW

Petitioner now turns to this Court for relief, asserting he received ineffective assistance of counsel because counsel failed to: (1) seek the appointment of an accident reconstruction expert; (2) present available exculpatory eyewitness testimony; and (c) object to testimony from Detective Matt Cashatt.   Petitioner further contends: (1) the prosecution failed to disclose material, exculpatory evidence; (2) the prosecution presented false testimony and (3) he is actually innocent.

## III.    FACTUAL BACKGROUND

In finding the evidence sufficient to support the conviction, the intermediate appellate court summarized the evidence at trial as follows:

> [A]lthough the dashboard camera (dash cam) audio/video recording from Sprague's patrol car did not show Sprague being struck by a vehicle, it did show only a few cars passing in front of the patrol car, one of them being a silver SUV which was apparently trying to exit the Park through the exit near Sprague's parked patrol car.  A "BOLO" (Be On the Look Out for) message was transmitted to all officers of the Texarkana Police Department, alerting them to watch for the Silver SUV.  Although the video recording captured the image of several cars leaving the Park, it does not show Sprague trying to detain any of them.  The reason that it does not show Sprague's attempts to detain automobiles is because he exited the range of the images recorded by the dash cam as he walked behind the patrol car into the parking lot.  Although the video portion of the recording does not capture Sprague's image, the audio portion continued to record the occurrences around him because the audio was being transmitted from a microphone on Sprague's person.  That audio portion of the recording revealed that Sprague yelled, "Hey, stop," but neither the video nor the audio recording indicate the identity of the person Sprague was directing his command to or the kind of car driven by that person.  It is impossible to determine from the recording the identity of the person to whom Sprague's comment was directed.
>
> John McGee testified that Sanders was present at the Park that night and that he was driving a silver SUV, but he did not believe Sanders ever got out of the vehicle.  As McGee was leaving, he saw the SUV attempting to exit the parking lot.  Although McGee said that he observed the SUV jump the curb and then saw the

officer on the ground, he candidly admitted that he did not see the silver SUV strike Sprague.  McGee testified that he stopped his vehicle and stayed with the injured Sprague while he and others called the 9-1-1 operator to report the injury.  On cross-examination, McGee admitted that at the time the officer was struck, he (McGee) was in the process of backing his car up when he saw the SUV jump the curb.

[S]anders was interviewed at the Texarkana police station by Cashatt.  Sanders admitted that he was at the Park that night and that he was the sole occupant and driver of a silver 2010 GMC Acadia (an SUV) that night.  Although he saw Sprague arrive at the Park before the commotion began and saw Sprague activate the overhead lights on his patrol car, he denied hitting anything with his SUV as he drove out of the Park.  Although Sanders initially maintained that he rolled through the Park and did not stop, he later changed his story somewhat to indicate that he did stop there to see his cousin.  After the interview, Cashatt obtained a warrant for Sanders' arrest, charging him with responsibility for Sprague's death.  At trial, Cashatt admitted that at an earlier writ hearing, he testified that whomever hit Sprague had not done so intentionally and that he believe[d] it to have been an accident.  At the time of the previous hearing, it was his opinion that Sanders had not seen Sprague when Sprague was run down.

Kechelle Dansby testified that she was at the Park at the time Sprague was run over by a car.  Dansby testified that she saw Sprague get out of his patrol car and stand under the brightest part of the street light.  She also saw a silver SUV back into a parking space before driving toward one of the Park exits, then jump the curb and bounce over that curb as Sprague was waving his hands in a fruitless attempt to stop the SUV.  Dansby testified that she then saw the silver SUV run over Sprague and saw his body go underneath it.  Although she saw Sanders driving a silver SUV that night, she did not testify as to the identity of the vehicle's driver at the time it struck the officer.  When she spoke with the police on the night in question, she falsely identified herself by her sister's name because she had outstanding warrants for her arrest at the time.  She did not reveal to the police what she had seen that night until after she had been arrested on an outstanding warrant.

Earnest Young was also present at the Park at the time of the events in question.  He saw Sanders standing next to a silver SUV, but never saw him get into it or drive it.  At trial, he testified that the car that struck Sprague "looked sorta like [the] one" Sanders had been standing near.  He testified that he did see the SUV jump the curb, and he saw the officer's flashlight go up in the air, but he did not see which car actually struck Sprague.  From what he saw, it did not appear to him that the SUV's driver saw the officer before the vehicle struck him.

Troy Davis was also at the Park when Sprague was run over.  He testified that he thought he saw Sanders sitting on the driver's side of a Silver SUV before the police officer arrived at the Park and believed Sanders was high on marihuana at the time because you could smell it in the area.  He said that although he saw the silver SUV drive toward the exit from the Park, the officer waved his flashlight at traffic, and then that SUV jumped the curb, but he did not see it drive towards the officer.  He

testified that he then believed that the SUV was about to get pulled over and, if so, that circumstance would allow the other cars to escape.  After he saw the SUV jump the curb, he observed it hesitate before leaving the area, and it was at that time that Daniels saw the officer and his flashlight on the ground.  He indicated that there were many cars attempting to leave the Park after Sprague arrived.  Because he was trying to leave the Park himself, he wasn't "paying attention to details."

A silver GMC Acadia, owned by Sanders' mother, was searched and subjected to tests by the police.  Officer Spence Price testified that when he entered the vehicle, he smelled the faint odor of marihuana.  After examining the SUV and removing its right front tire, Price placed a different tire on the vehicle so that the car could be released back to its owner.  Tests revealed that although there were no scratches or dents on the car, the plastic brush guard of the vehicle had been pushed out about a quarter of an inch.  Although a search was made by police investigators for them, none of Sprague's DNA, fingerprints, fluids, or personal effects were found on the car.  A search warrant was obtained for the electronic "black box" from the SUV, but it contained no data indicating that the vehicle had been in an accident.

The medical examiner who autopsied Sprague opined that the cause of death was the injuries sustained by Sprague, those injuries being consistent with being struck by a vehicle.  He further testified that the abrasions on Sprague's body were consistent with being dragged over either asphalt or a rocky surface and that the cause of death was blunt force injuries.

Crime Scene Investigator Price noted a reddish-brown mark and tears on the officer's duty shirt that he believed were transfers of dirt caused by a vehicle.  There were small marks on the back of the officer's shirt that appeared to be caused from the uniform catching on a rocky surface or asphalt.  Sprague's duty gear, including his badge, radio, radio clip, handcuffs, and his handgun were also damaged in a manner consistent with being dragged over a rough surface.

Officer Marc Sullivan, a crime scene technician, testified that he examined the undercarriage of Sanders' mother's SUV and that it appeared some dirt had been removed on the passenger side of the car and the passenger side wheel well, although it could have been caused by something as simple as a tire rub.  He also noticed that the bumper was pushed out about one quarter of an inch and retention clips were broken, but he indicated that there was no way to tell when the retention clips had been broken or what happened that caused them to break.  Due to the presence of water spotting, Sullivan deduced that the car appeared to have been wiped down; while there were a few marks on the tires, those marks did not come from anything worn by Sprague.  Shawna Yonts, another crime scene technician, testified that she saw a disturbance in the dust on the hood of the SUV and the presence of partial fingerprint impressions in the dust, but she acknowledged that there was no way of telling when the disturbance in the dust or the fingerprints occurred.

*Sanders v. State*, 2015 WL 4744406, at *17–19.

## IV.     STANDARD OF REVIEW

Title 28 U.S.C. § 2254 authorizes the District Court to entertain a petition for writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment if the prisoner is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  The Court may not grant relief on any claim that was adjudicated in state court proceedings unless the adjudication:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court.  28 U.S.C. § 2254(d).  A decision is contrary to clearly established federal law if the state court reached a conclusion opposite to a decision reached by the Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court has on a materially indistinguishable set of facts.  *See Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  An application of clearly established federal law is unreasonable if the state court identified the correct governing legal principle, but unreasonably applies that principle to the facts.  *Id*. An unreasonable application of law differs from an incorrect application; thus, a federal habeas court may correct what it finds to be an incorrect application of law only if this application is also objectively unreasonable.  *Id*. at 409-11.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation omitted).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Id*.  The Supreme Court has noted that this standard is difficult to meet "because it was meant to be."  *Id*.

This Court must accept as correct any factual determinations made by the state courts unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28

U.S.C. § 2254(e).  The presumption of correctness applies to both implicit and explicit factual findings.  *See Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004); *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001) ("The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact.").  Deference to the factual findings of a state court is not dependent upon the quality of the state court's evidentiary hearing.  *See Valdez*, 274 F.3d at 951.

## V.  ANALYSIS

### A.  Ineffective Assistance of Counsel

#### 1.  Legal Standard

When addressing the issue of what a petitioner must prove to demonstrate an ineffective assistance of counsel claim, courts look to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *See United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004).  To show that counsel was ineffective a petitioner must demonstrate:

> First . . . that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings it cannot be said that the conviction . . . resulted in a breakdown of the adversarial process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  To prove the prejudice prong, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009).  "*Strickland* asks whether it is 'reasonably likely' the result would have been different."  *Harrington v. Richter*, 562 U.S. at 111.

A habeas petitioner must "affirmatively prove," not just allege, prejudice.  *Day*, 556 F.3d at 536.  If a petitioner fails to prove the prejudice part of the test, the court need not address the question of counsel's performance.  *Id*.  A reviewing court "must strongly presume that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy."  *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992).  In determining the merits of an alleged Sixth Amendment violation, a court "must be highly deferential" to counsel's conduct.  *Strickland*, 466 U.S. at 687.

Whether the representation was deficient is determined as measured against an objective standard of reasonableness.  *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999).  "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."  *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) (quoting *Garland v. Maggio*, 717 F.2d 119, 2006 (5th Cir. 1983)).  "There is a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."  *Woodward v. Epps*, 580 F.3d 318, 329 (5th Cir. 2009) (quoting *Romero v. Lynaugh*, 884 F.3d 871, 876 (5th Cir. 1989)).

Analysis of an ineffective assistance claim on federal habeas review of a state court conviction is not the same as adjudicating a similar claim on direct appeal of a federal conviction. *Harrington*, 562 U.S. at 101.  The key question on federal habeas review is not whether counsel's performance fell below the *Strickland* standard, but whether the state court's application of *Strickland* was unreasonable.  *Id*.  The deferential standard applicable to federal habeas review requires federal courts to apply a "doubly deferential" standard of reviews to claims of ineffective assistance, under which both the conclusions of the state court and strategic decisions of defense counsel are given the benefit of the doubt.  *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

2.    **Application**

    *a)*    *Failure to Seek the Appointment of an Accident Reconstruction Expert*

Initially, Petitioner faults counsel for failing to conduct any significant investigation into certain facets of the crime.  He asserts counsel improperly chose to take the prosecution's identification of Petitioner's car as the suspect vehicle despite a lack of physical evidence linking the vehicle to the collision.  Petitioner states that instead of conducting an independent investigation of the facts, counsel simply relied on the prosecution's investigation.

Specifically, Petitioner contends counsel should have sought the appointment of an accident reconstruction expert.  He states this type of expert could have provided the jury authoritative information about the meaning of the crime scene evidence or lack thereof.

Petitioner has presented a Collision Reconstruction Report, a Vehicle Specifications Report and an affidavit from Tim Lovell, an accident reconstruction expert.  Petitioner states Mr. Lovett concluded that the damage to Petitioner's vehicle was not consistent with the damage patterns seen on Officer Sprague's body.  He also states that the trajectory of the debris field was not consistent with the prosecution's claim that Petitioner's car went over the grassy median and then struck Officer Sprague.  Mr. Lovett stated:

> if the vehicle that struck Officer Sprague had come across the curb and then exited onto the main road, the vehicle would have been traveling northeast.  That is a simple fact.  As it pertains to this incident, Officer Sprague and the items from his pocket and radio, eyeglasses, etc., that were found in a line to the east, would have followed the line of force.  That would mean those items would have created a line to the northeast.

Preliminary Collision Reconstruction Report, attached as Exhibit C to the Memorandum of Law in Support of Petition for Writ of Habeas Corpus, at 4.

Petitioner also states Mr. Lovell concluded that the tire marks found on the curb and in the grassy median, which officers told jurors matched the track width of the GMC Acadia, did not in

fact match Petitioner's vehicle.  Mr. Lovett states the officers used the wrong measurement in their comparison.  Mr. Lovett further concluded that none of the physical evidence taken from the Acadia connects it to Officer Sprague.

Petitioner contends counsel's failure to present testimony from an accident reconstruction expert constitutes deficient performance because in the absence of such testimony the jury only heard from police officers who were not qualified in the field of accident reconstruction.  He also contends that in light of the spurious eyewitness testimony which the prosecution urged the jury to rely on, there is a reasonable likelihood at least one juror would have found Petitioner not guilty if there had been testimony from an accident reconstruction expert.

The state habeas trial court described the conclusions reached by Mr. Lovett as follows:

1.  There were many facets of this case not explored during trial or during trial preparation by trial counsel.

2.  The damage done to the car driven by Applicant was not consistent with the damage patterns seen on Officer Sprague's body.

3.  The trajectory of the debris field was not consistent with the State's claim that Applicant's car went over the grassy median then struck Officer Sprague.

4.  None of the physical evidence taken from the GMC Acadia connects it to Officer Sprague.

5.  The examination of Applicant's car was incomplete.  A more comprehensive look at the undercarriage was needed.

6.  Even faced with several witness statements pointing to other suspect vehicles, officers became completely focused on Justin Sanders to the exclusion of any other possibilities.

7.  Why was "C-Lo never identified.  Where is he and where did his Grand Marquis go?"[1]

---

[1]  On page 2 of his Preliminary Collision Reconstruction Report, Mr. Lovett states that witness Michael Jordan told Detective Cashatt that an individual names "C-Lo" was in the park that night driving a gray Mercury Grand Marquis.  Mr. Jordan told Detective Cashatt that a brownish gold four door car struck Officer Sprague first.

Docket No. 10–21, Order Recommending Denial of Applicant's Application for Writ of Habeas

Corpus ("Order"), Supplemental State Habeas Clerk's Record ("SSHCR") at 40.

Based on an affidavit from trial counsel, the state habeas trial court found:

1.  Counsel did not take the State's accusation that Applicant's car struck the decedent at face value.

2.  Counsel watched the dash cam footage hundreds of times.

3.  Counsel went to the crime scene while all law enforcement markings, made in paint were still visible.

4.  Trial counsel, together with Rick Shoemaker and Bart Veal, recreated what they observed from the camera footage, measured distances and timed vehicles driving from the same spot where Applicant's vehicle was parked to the approximated spot of the collision at multiple speeds.

5.  Trial counsel felt that the more strategic decision was to argue reasonable doubt as to which vehicle struck [Officer Sprague]—that Applicant's vehicle did not strike decedent because the collision sensor did not record a collision—and to argue that even if Applicant's vehicle did strike decedent, it was an accident, not a crime because Applicant was not evading arrest with a motor vehicle.

6.  Trial counsel spoke with an accident reconstruction expert from Conroe, Texas, but he was not retained for the reasons set forth above.

Order, SSHCR at 41–42.

The court then made the following additional findings:

1.  The expert's first conclusion that there were "many facets of this case not explored," is conclusory and speculative.

2.  With regard to the expert's second conclusion, Applicant has not established that the expert is qualified to assess damage caused to a human body.

3.  With regard to the expert's fifth conclusion that a more comprehensive look at the undercarriage of the car was needed to look for rub marks, cloth fibers, skin transfers, etc,  Applicant has failed to show how any additional evidence discovered on the undercarriage would have been beneficial to him.  To the contrary, any rub marks, cloth fibers, or skin transfers would have been detrimental to Applicant's case.

4.  The expert's sixth and seventh conclusions are conclusory and speculative and outside of his expertise.

Order, SSHCR at 42.

Based on these findings, the court concluded that trial counsel's decision not to seek appointment of an accident reconstruction expert was trial strategy, and that counsel was not ineffective for failing to do so.

It is possible that an accident reconstruction expert would have aided Petitioner's defense. But this is not a case where counsel did not investigate the situation or consider seeking the appointment of an expert.   Instead, the state court found that counsel conducted his own investigation into the facts and consulted an expert in accident reconstruction.

Those findings are not unreasonable in light of the record before the state court. Counsel, after considering the matter, concluded an accident reconstruction expert was not needed to support the defense's theory.  Counsel could have reasonably concluded the fact that the vehicle's sensor did not record a collision was sufficient to create reasonable doubt as to whether it was Petitioner's car that struck Officer Sprague.  He could also have reasonably concluded that if that theory failed, there was still reasonable doubt as to whether Petitioner's actions constituted a crime.

As set forth above, counsel's strategic choices are entitled to a high degree of deference. That is particularly so where, as here, counsel considered the course of action Petitioner faults him for not pursuing.  As a result, the state court's rejection of this ground for review was not contrary to, or an unreasonable application of, clearly established federal law.

> b)      *Failure to Present Testimony of Exculpatory Eyewitnesses*

Next, Petitioner states counsel should have called three key eyewitnesses to testify on his behalf.  The first witness Petitioner identifies is Jaylon Rutherford.  Petitioner states that Mr. Rutherford would have testified that Petitioner's vehicle jumped the left curb, rather than the grassy median, in order to avoid Officer Sprague and that the car that cut in behind Petitioner, which was either a gray or silver sedan like a Grand Marquis, struck the officer.  Petitioner states

that in contrast to the prosecution's witnesses, who viewed the area where Officer Sprague was struck from across the road on the other side of flashing patrol lights, Mr. Rutherford was in the car directly behind Petitioner's car until the gray car cut directly in front of them.

Petitioner also identifies Johnathan Hunt, who was driving the vehicle Kechelle Dansby, a witness for the prosecution, was riding in.  Mr. Hunt would have testified that from where they were, Ms. Dansby could not have seen Petitioner's vehicle strike Officer Sprague as she testified. He would have stated Ms. Dansby never said anything while they were in the car about having seen the collision.  In addition, Mr. Hunt would have testified the he, like Mr. Rutherford, saw Petitioner's car bouncing up and down after he drove over the curb.

The final witness Petitioner identifies is Kiante Boyd.  Detective Cashatt testified at trial that Petitioner had told him during a videotaped interview that he had left the park and gone to Mr. Boyd's home.  Detective Cashatt told the jury that despite an exhaustive search, the police were unable to locate Mr. Boyd, and that he believed Mr. Boyd did not exist.  Petitioner contends Mr. Boyd would have testified that he saw Petitioner in the early morning hours of June 14, 2013, as Petitioner told police.  Mr. Boyd was not at the park and was house-sitting for his uncle.  He would have testified he did not see any damage to the car and that Petitioner did not say anything about being involved in an incident in the park.

With respect to Mr. Rutherford, the state habeas trial court, based on counsel's affidavit, made the following findings:

> 1. [Counsel] met with Rutherford on at least two occasions and spoke to him on the phone on more than one occasions.
>
> 2.  The statements in Rutherford's Affidavit are not what he told trial counsel when they met.
>
> 3.  Rutherford told trial counsel that he did not see who struck the victim and only saw the aftermath of the accident.

4.  Trial counsel had planned to call Rutherford as a witness to prove up that Applicant spoke to him on the night in question.

5.  Because Rutherford was arrested for armed robbery prior to Applicant's trial, trial counsel decided that any value from Rutherford's testimony was greatly outweighed by potential prejudice of having Applicant associated with an armed robber.

6.  If trial counsel had had certain "newly discovered evidence," he would have called Rutherford to testify.[2]

Order, SSHCR at 44.

Based on these findings, the trial court concluded it was trial strategy for trial counsel not to call Mr. Rutherford to testify, based on the information Mr. Rutherford provided to trial counsel and given the fact that Mr. Rutherford was arrested for armed robbery prior to trial.  The court concluded there was no merit to Petitioner's claim on this ground.

Regarding Mr. Hunt, the trial court, based on counsel's affidavit, found as follows:

1.  Trial counsel's investigator attempted to contact Hunt months before trial but Hunt never returned the phone calls.  Trial counsel attempted to contact Hunt prior to trial, without success.

2.  Applicant contacted Hunt and asked him to contact trial counsel, but he failed to do so.

3.  During trial, Applicant told trial counsel that Hunt was told his testimony was not needed by the State.

4.  During trial, Applicant told trial counsel for the first time that Hunt had useful testimony.  He stated he had spoken to Hunt on the phone after trial had concluded for the day.  He gave trial counsel Hunt's phone number.

5.  Trial counsel placed several calls to Hunt that evening and sent at least one text message to him but Hunt never called trial counsel back.

6.  Trial counsel could not verify the information Applicant had given him.

7.  Because Hunt was uncooperative and non-responsive, trial counsel did not attempt to subpoena him.  Strategically, he felt calling a witness that would not

---

[2]  The newly discovered evidence is described below.

speak to him was a bad idea.  He did not want to run the risk of Hunt testifying Applicant was guilty.

Order, SSHCR at 46.

Based on these findings, the court concluded counsel's decision not to call Mr. Hunt to testify was trial strategy and that counsel was not ineffective for failing to do so.

Regarding Mr. Boyd, the state habeas trial court made the following findings:

1.  Trial counsel spoke to Kiante Boyd prior to trial.

2.  Because of certain pre-trial rulings, trial counsel made a strategic decision not to call Boyd to testify.[3]

3.  If trial counsel had known that Investigator Cashatt would testify Boyd did not exist, he would have been prepared to call him to refute the testimony; however, he is not sure whether the reward for showing Boyd existed outweighed certain disadvantages to having him available for cross-examination.

Order, SSHCR at 47.

Based on the foregoing, the court found counsel's decision not to call Mr. Boyd to testify was trial strategy and that counsel was not ineffective for failing to do so.

Complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  To prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must identify the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.  *Id*. (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).  The requirements of showing availability and

---

[3]  The pre-trial rulings are not described in the affidavit.

willingness to testify "[are] not a matter of formalism." *Woodox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010).  A petitioner must present evidence on these points as part of the burden of proving trial counsel could have found and presented a favorable witness. *Id*.

With respect to Mr. Rutherford, the state court found as a fact that counsel met with Mr. Rutherford prior to trial and that Mr. Rutherford did not tell counsel the same thing he states in his current affidavit.  This finding was not an unreasonable determination of the facts before the court. Further, Mr. Rutherford was arrested for armed robbery prior to trial.

In light of the difference between what Mr. Rutherford told counsel and what he states in his affidavit, and considering the prejudice that could result from Petitioner calling someone arrested for armed robbery to testify on his behalf, counsel's considered decision not to call Mr. Rutherford to testify was not unreasonable and does not entitle Petitioner to relief.

The state court found that counsel made unsuccessful attempts to contact Mr. Hunt.  As a result, counsel was not able to speak with Mr. Hunt and verify that he would provide favorable testimony. Counsel determined as a matter of trial strategy that Mr. Hunt should not be called to testify because he had not been cooperative and counsel did not know what his testimony would be.  This determination was not an unreasonable strategic choice.

In addition, Mr. Hunt does not state in his affidavit that he was available and willing to testify.  Instead, he states he was afraid to come testify because the police had been threatening him and others with jail.  As a result, Petitioner's claim regarding Mr. Hunt not being called to testify does not satisfy the standard set forth in *Day* regarding uncalled witnesses.

Regarding Mr. Boyd, the state habeas court found counsel made the strategic decision not to call him because of certain pre-trial rulings.  Admittedly, it would have been useful for counsel

to have described those rulings in his affidavit.  But, in light of the record in state court, this finding was not unreasonable.

Moreover, even if it could be concluded counsel's decision not to call Mr. Boyd was unreasonable, Petitioner still would not be entitled to relief.  Mr. Boyd's affidavit does not state he was available and willing to testify.  Petitioner has therefore not satisfied the standard set forth in *Day* for granting relief based upon uncalled witnesses.

Counsel's strategic choices are entitled to great deference.  With that in mind, the Court is unable to conclude that the decision of the state courts not to grant relief based on this ground for review was contrary to, or an unreasonable application of, clearly established federal law.

### c)    Failure to Object to Testimony

In Petitioner's view, at trial Detective Cashatt improperly expressed an opinion about the credibility of Petitioner's videotaped statement to police in which he denied involvement in the offense.  Petitioner says this testimony improperly invaded the province of the jury to determine Petitioner's credibility for themselves and that counsel should have objected to the testimony.

In considering this argument, the state habeas trial court found:

1.   Trial counsel did fail to object to the testimony in question of Investigator Cashatt.

2.  Any question of veracity was proven by the camera footage which showed that Applicant was at the scene when Officer Sprague arrived.

3.   Investigator Cashatt's allegedly improper testimony was limited to whether Applicant was at the scene when the victim arrived.

4.  Applicant denied being at the scene when the victim arrived, but his vehicle was captured on the victim's dash cam.

5.  Strategically, trial counsel felt it was not advantageous to draw more attention to the testimony by objecting to it, when the same would be proven by proper means.

6.   Trial counsel expected a long trial and was hopeful that if he did not draw attention to the issue, it would not resonate with the jurors by the end of trial.

Order, SSHCR at 48.

Based on these findings, the court found trial counsel's decision not to object to the testimony to be trial strategy and that counsel was not ineffective for failing to object.

As found by the state court, counsel could have reasonably concluded it was better not to call attention to this testimony by lodging an objection.  In addition, the focus of this testimony was whether Petitioner was in the park when Officer Sprague arrived.  As there was other evidence establishing Petitioner's presence, there is not a reasonable probability the result of the proceeding would have been different if counsel had objected to the testimony.  The failure to object therefore did not result in prejudice.  As a result, the conclusion that this ground for review does not establish ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law.

### B.     Failure to Disclose Exculpatory Evidence

#### 1.     Legal Standard

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused . . . violated due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* also applies to evidence that could be used for impeachment purposes. *Edmond v. Collins*, 8 F.3d 290, 293 (5th Cir. 1993).  To establish that *Brady* was violated, a habeas petitioner must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the petitioner and (3) the evidence was material.  *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991).  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

2. **Application**

Petitioner states it is possible the prosecution failed to disclose material, exculpatory evidence.  This consisted of unidentified evidence found on the tire returned to Petitioner's mother two years after trial.  Petitioner's current counsel candidly admits she has been unable to determine the character or identity of the evidence, whether it was ever tested or whether it is even related to the case.  Petitioner nonetheless states he is asserting the claim out of an abundance of caution in the event it is determined the evidence was recovered from the scene.

In an affidavit, Petitioner's mother stated that when the tire was unwrapped, she found a gold envelope inside, with writing on the outside, that had been torn open.  Inside were two smaller gold envelopes with writing on them that contained multiple folded pieces of waxed paper with writing on them.  Also in the envelope was a small, clear plastic case which appeared to contain several pieces of broken plastic.  While acknowledging it is unclear whether the items were part of the case, Petitioner states that it would have been improper if the pieces of plastic were recovered from the scene and not turned over to police.  He states the broken pieces would have indicated some other vehicle sustained damage, which would have supported the contention that some other vehicle struck Officer Sprague.

Based on the affidavit of Ms. Nelson, the state habeas trial court made the following findings:

> 1.  On the day Applicant was arrested, the Texarkana Police Department took custody of her 2010 GMC Acadia.  The vehicle was returned to her later that day; however, the front passenger-side tire and wheel were not returned.  She was advised they were retained for further testing.
>
> 2.  After Applicant's trial, she requested the Texarkana Police Department return the tire and wheel to her, which they agreed to do in April 2016.  She picked it up from the Bi-State Justice Building.
>
> 3.  When she picked it up, it was still wrapped in brown butcher paper, taped shut, and had multiple evidence stickers on it.  Upon opening the wrapping, inside the

tire she discovered a gold envelope with evidence stickers and writing on the outside, and the envelope appeared to have been torn open.  Inside the envelope were two smaller gold envelopes, also with writing and evidence stickers on the outside, also opened, each containing multiple folded pieces of wax paper with writing on them.  Also in the envelope was a small, clear plastic case which appeared to contain several pieces of broken plastic.

4.  She immediately turned the envelope over to Applicant's appellate lawyer.

Order, SSHCR at 49–50.

Based on counsel's affidavit, the court also found:

1.  Item 02-01-AA is a collection of multiple pieces of a broken, clear substance that did not come from decedent's duty rig, nor Appellant's vehicle, and trial counsel was not in possession of the item labeled 02-01-AA at the time of trial. There was a lack of damage to the vehicle driven by Applicant, and there was an absence of any impact in the crash recorder.  Trial counsel believed that this evidence suggested that another vehicle with damage to a headlight or other clear plastic part was the vehicle that struck decedent.

2.  The report attached as Exhibit "A" to the State's Response is a Report from the DPS Garland Crime Lab, reflecting that two packages were delivered in person by Cashatt.  Item 01 was a large brown box containing items labeled as 01-18 through 01-62.  Item 02 was a large brown paper wrapped item.  The Report does not state 02-01-AA.

3.  Pursuant to the court's discovery order, prior to trial, trial counsel Will Williams and Rick Shumaker, as well as Bart Veal, went to the conference room of the District Attorney's office to inspect all physical evidence.  ADA Samantha Oglesby, ADA  Kelly Crisp, DA Investigator Robbie McCarver and Texarkana Police Department CST Spencer Price were present at the meeting.  Trial counsel believes Matt Cashatt may have been present, but he is not certain.

4.  During the inspection, they viewed every item on the report and each item contained in 01 was opened and presented for inspection.

5.  Item 02 was the front passenger tire and wheel of Applicant's vehicle.

6.  The officers told trial counsel that the only thing in item 02-01 was the tire from Applicant's vehicle.  They stated they could unwrap it all of the way but would have to rewrap it.

7.  Trial counsel does not remember if the officers requested that they only unwrap the portion trial counsel needed to see.  He does remember a conversation about whether it was necessary to unwrap the entire item.  Based on the officers' statements that the only thing in the package was the tire and based on the fact that

the two ADAs present did not contradict those statements, trial counsel told the officers they did not need to see anything on the tire besides the spot on the wheel that had black vehicle paint on it.

8.   Trial counsel makes no claims any evidence was intentionally withheld by anyone at the District Attorney's office or by the Texarkana Police Department.

Order, SSHCR at 50–52.

Based on the state's answer to the state application for writ of habeas corpus, it was found that:

1.   Defense counsel signed a Receipt of Discovery on March 6, 2014, specifically identifying "DPS Trace Analysis Lab Report," the report in question.

2.   The State gave the defense every opportunity to review, investigate and inspect the evidence.

3.   At a minimum, trial counsel spent an entire day at the District Attorney's office with his team, inspecting the evidence.

4.   The Trace Analysis Laboratory Report, dated March 6, 2014 and attached as Exhibit A, reflects Laboratory # GAR-1307-09526.  It reflects "01-Large Brown box on July 26, 2013 by Cashatt, Matt VIA in Person" and "02-Large Brown Paper Wrapped Item on July 26, 2013 by Cashatt, Matt VIA In Person."

5.   Under the heading "Evidence Description, Results of Analysis and Interpretation," it reflects "01: Large Brown Box" followed by items identified as numbers 01-18 through 01-62 and "02: Large Brown Paper Wrapped Item" followed by "02-01: Right front tire from passenger vehicle (Item SV-1)."

6.   Item 01-26 under the heading "01: Large Brown box" is identified as "Scrappings from SV-1 (Item SC-1)."  As set forth above, the front tire is identified as "SV-1."

7.   The first paragraph following the listing of items in the "DPS Trace Analysis Lab Report" states, "the recovered scrapings from the tire (Ex. 01-26) and the black smears removed from the rim of the tire (Ex. 02-01) are composed of a polypropylene plastic and three layer black automotive chips."

Order, SSHCR at 52–53.

The court also received an affidavit from Justin Parker.  Based on this affidavit, the court found:

1.  Justin Parker is a Forensic Scientist, Trace Evidence, with the Texas Department of Public Safety in the Garland Regional Laboratory.  He conducted the forensic tests on the trace evidence Lab Case # GAR-1307-09526 for the case in question.

2.  He has reviewed his bench notes, and the evidence at issue is plainly accounted for within policy of the Texas Department of Public Safety.

3.  The plastic container in the packaged tire contains a microscope slide that he made during his analysis of Smear A recovered from the tire (EX. 02-01).  The slide appears to have been damaged at some point.  There is frosted glass in that plastic container that is the labeled part of the slide.

4.  The Laboratory Information Sheet attached to the Affidavit states that Ex, 02-01, the tire, had several black smears present on the rim of the tire.  The smears were collected to individual glassine folds.  Some residue remained on the tire rim. Most smears came off the tire as a thin film.  They were examined stereoscopically. The films were clear to light brown in color.  Several black chips were noted sitting on and around thin films—apparent 3-layer system (clear, black, gray), possible automotive paint, all chips visually consistent in color and apparent layer sequence to one another, one chip sampled for IR analysis.  The smears were sampled for IR analysis.  A handwritten note reflects "smears given Ex. 02-01."  At the time Parker completed the report, he handwrote "Ex.02-01-AA" but the scanner did not pick up "AA."  "Known rubber samples from the tire (both tread and sidewall areas) collected for possible use in further analysis."  A handwritten note reflects they were labeled "Ex-02-01-AB."  The scientist conducting the analysis will assign an numerical designation to the evidence, which allows the evidence to be tracked through the system.

5.  The section of the Report identified as "IR Interpretation and results" states that "the recovered smears from Ex. 02-01 A through F and Ex. 01-26 thin film and large mass are consistent with talc and polypropylene."

6.  The derived evidence is reported out on the report under "Evidence Description, Results of Analysis and Interpretation."  This evidence is discussed in the Trace Analysis Laboratory Report, dated March 6, 2014, in the first two full paragraphs after the evidence is lifted.  As set forth above, it discussed the black smears recovered from the rim of the tire and the black paint chips.

7.  At the conclusion of his analysis, the derived evidence was packaged with the main evidence.

Order, SSHCR at 52–53.

After making the findings set forth above, the court stated:

According to Applicant's Memorandum, it appear the evidence at issue in his *Brady* claim is what he refers to as "clear broken plastic."  According to the Affidavit of

Justin Parker, it appears the "broken plastic" was actually a glass slide that was damaged.  To the extent Applicant relies on the smears for his *Brady* claim, the court finds the smears were identified in the first full paragraph of the Trace Analysis Laboratory Report, which trial counsel received, as established by his signature on the document titled, "Receipt of Discovery/Pick-Up."  Further, the Court finds that trial counsel was given the opportunity to examine the evidence identified on the Report and spent a significant amount of time reviewing the evidence.  Therefore, the Court finds that the State did not fail to provide exculpatory or impeachment evidence at trial.

Order, SSHCR at 49–55.

The facts surrounding this ground for review are complicated.  As a result, the state court made meticulous findings of fact, ultimately concluding that what Petitioner states might be new undisclosed evidence was actually part of the evidence presented to counsel for his inspection prior to trial.  This finding is not an unreasonable determination based on the evidence before the state court and Petitioner has not rebutted the presumption of correctness afforded the state court finding by clear and convincing evidence.  *See* 28 U.S.C. § 2254(c)(1).[4]

As there was no undisclosed evidence, there was no *Brady* violation.  The state courts therefore did not act contrary to, or unreasonably apply, clearly established federal law in rejecting this ground for review.

### C.      Presentation of False Testimony

#### 1.      Legal Standard

To obtain relief based on the state's use of perjured testimony, a habeas petitioner must show that: (1) the witness's testimony was actually false; (2) the testimony was material and (3) the prosecution had knowledge that the testimony was false.  *United States v. Scott*, 48 F.3d 1389,

---

[4]  Section 2254(c)(1) provides that: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

1394 (5th Cir. 1995).  The false testimony is material if there is any reasonable likelihood that it could have affected the judgment of the jury.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  Simply because testimony at trial is different does not equate to perjury.  *See Koch v. Puckett*, 907 F.2d 524, 531 (1990).  Contradictory testimony from witnesses or inconsistencies in testimony are to be resolved by the trier of fact and do not suffice to establish that testimony was perjured.  *Id*.

2.      **Application**

Petitioner states Detective Cashatt testified falsely that Mr. Boyd did not exist, which impeached Petitioner's statement to police denying involvement in the incident.  Petitioner states Detective Cashatt testified he served as the resource officer at Liberty-Elyau High School and knew Principal William Houff.  Nevertheless, he claimed to be unaware Mr. Boyd was Mr. Houff's nephew.  Petitioner contends these statements are belied by Mr. Boyd's statement that at the time of the investigation and trial he was living on Houff Lane, where all his family lived, and working at the concession stand at Spring Lake Park.  Mr. Boyd also says that someone from the District Attorney's office attempted to contact him through Facebook prior to trial.

With respect to this ground for review, the state habeas trial court made the following findings based on counsel's affidavit:

1.  Investigator Cashatt had seized Applicant's phone and downloaded the entirety of its contents.

2.  Boyd's number was in the phone.

3.  Boyd had a Facebook account since at least 2011.

4.  Boyd had a Texas driver's license since 2009.

5.  Boyd had school records at the school where Investigator Cashatt worked as a police officer.

6.  Trial counsel believes the statement in question was intended to be taken literally, not as hyperbole.

7.  Trial counsel believes the testimony in question had an effect on the outcome of the case.

Order, SSHCR, at 55–56.

After observing that the state took the position that the testimony in question, when taken in  its entirety, was hyperbole, the state habeas trial court found that Petitioner failed to meet his burden:

> Without making a finding as to whether false or misleading testimony was presented to the jury, the Court finds that even assuming for purposes of this argument that the testimony of Investigator Cashatt was false or misleading, Applicant has failed to meet his burden.  Applicant could have raised this issue on direct appeal- he knew at the time of trial and, accordingly, at the time of appeal, that Kiante Boyd did exist.  Therefore he must show by a preponderance of the evidence that the alleged violation contributed to his conviction or punishment.

> Applicant had stated that he saw Boyd after the incident in question.  Investigator Cashatt's testimony as to the existence of Boyd was less than pivotal to the outcome of Applicant's trial, especially in light of the evidence presented at trial.  The Court finds that Applicant failed to show by a preponderance of the evidence that the testimony in question contributed to Applicant's conviction or punishment.

Order, SSHCR, at 56–57.

In essence, the state court concluded that this part of Detective Cashatt's testimony was not material.  Detective Cashatt's testimony called into question the veracity of Petitioner's assertion that he talked to Mr. Boyd after the incident.  If the jury concluded Petitioner's assertion was false, that could have caused them to question the truthfulness of the rest of this statement. And in any event, whether Petitioner talked to Mr. Boyd only tangentially relates to whether Petitioner was in the park and was driving the car that struck Officer Sprague.  There was other evidence for the jury to rely on in making these determinations.  As a result, even if Detective Cashatt had not testified that Mr. Boyd did not exist, there is not a reasonable likelihood it would have affected the judgment of the jury.  The conclusion of the state courts regarding this ground for review was therefore not contrary to, or an unreasonable application of, clearly established federal law.

### D.    Actual Innocence

Finally, Petitioner asserts that based upon new evidence he is actually innocent of the offense of murder.  A freestanding claim of actual innocence, however, does not provide a basis for federal habeas relief.  *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *Coleman v. Thaler*, 716 F.3d 895, 908 (5th Cir. 2013).  As a result, this ground for review may not be considered in this proceeding.

### E.    Evidentiary Hearing

Petitioner asks the Court to conduct an evidentiary hearing in this matter.  The decision to conduct an evidentiary hearing regarding a habeas petition is left to the "sound discretion of the district court."  *Barrientes v. Johnson*, 221 F.3d 741, 770 (5th Cir. 2000).  "In determining whether to grant a hearing, the judge must review the answer [and] any transcripts and records of state-court proceedings . . . to determine whether an evidentiary hearing is warranted."  *Richards v. Quarterman*, 566 F.3d 553, 562-63 (5th Cir. 209) (internal quotations omitted).  In cases where a district court "has before it sufficient facts to make an informed decision regarding the merits of a claim," the court may properly deny the petitioner an evidentiary hearing.  *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000).

The Court has reviewed the record in this matter.  The habeas record before the state court and now before this Court, which includes an affidavit from trial counsel as well as other affidavits referred to above, is sufficient for the Court to decide the issues raised by petitioner.  As a result, the Court is of the opinion that an evidentiary hearing is not required.

### F.    Certificate of Appealability

Petitioner is not entitled to the issuance of a certificate of appealability.  An appeal from a judgment denying federal habeas corpus relief may not proceed unless a judge issues a certificate

of appealability.  *See* 28 U.S.C. § 2253.  The standard for granting a certificate of appealability requires the petitioner to make a substantial showing of the denial of a federal constitutional right. *See Slack v. McCaniel*, 529 U.S. 473, 483-84 (2000); *Elizalde v. Dretke*, 362 F.3d 323, 328 (5th Cir. 2004).  In making that substantial showing, a petitioner need not establish that he should prevail on the merits.  Rather, he must demonstrate that the issues are subject to debate among jurists of reason, that a court could resolve the issues in a different manner or that the questions presented are worthy of encouragement to proceed further.  *See Slack*, 529 U.S. at 483-84.  Any doubt regarding whether to grant a certificate of appealability is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination.  *See Miller v. Johnson*, 200 F.3d 274, 280-81 (5th Cir. 2000).

Here, Petitioner has not shown that any of the issues raised by his claims are subject to debate among jurists of reason.  The factual and legal questions advanced by Petitioner are not novel and have been consistently resolved adversely to his position.  In addition, the questions presented are not worthy of encouragement to proceed further.  Therefore, Petitioner has failed to make a sufficient showing to merit the issuance of a certificate of appealability.

## VI.    CONCLUSION

For the reasons set forth above, Petitioner's petition for writ of habeas corpus should be denied and dismissed.  Accordingly, it is

**ORDERED** that the above-styled petition for writ of habeas corpus is **DENIED** and **DISMISSED WITH PREJUDICE**.

**So ORDERED and SIGNED this 26th day of July, 2021.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE